# NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

2019 CU 0115

T.C.B.

VERSUS

C.D.B.

Consolidated with

2019 CU 0116

T.C.W.

VERSUS

C.D.B.

Judgment Rendered: **NOV 1 3 2019**

* * * * * * *

APPEALED FROM THE TWENTY-FIRST JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF TANGIPAHOA
STATE OF LOUISIANA
DOCKET NUMBER 2011-0002257
c/w 2017-0001340

HONORABLE JEFFERY T. OGLESBEE, JUDGE

* * * * * * *

Angela Cox Williams
Jesmin Basanti Finley
Slidell, Louisiana

Attorneys for Plaintiff/Appellee
T.C.B.


Corey B. Blunk
Amite, Louisiana

Attorney for Defendant/Appellant
C.D.B.

**BEFORE: McDONALD, CRAIN, and HOLDRIDGE, JJ.**

Crain, J. Concurs (by jimm)

Holdridge J. Concurs in part + dissents in part

**McDonald, J.**

This is an appeal from a custody judgment that, among other things, granted sole custody of the parties' two children to their mother, T.C.B., and denied their father, C.D.B., any visitation. After a thorough review, we affirm the trial court judgment.

## ABBREVIATED FACTS AND PROCEDURAL HISTORY

T.C.B. and C.D.B. were married on October 11, 2003, in St. Tammany Parish. They are the parents of twin daughters, referred to herein as J.C.B.1 and J.C.B.2, born on October 28, 2005. Since July 11, 2011, when T.C.B. filed a petition for divorce and injunctive relief, the parties have engaged in extensive and highly contentious legal proceedings. This has resulted in numerous stipulated and considered judgments for custody and ancillary matters. The parties were granted a divorce on October 8, 2012.

The following actions are most relevant to this appeal. Following a hearing on June 18, 2015, the trial court signed a joint custody plan and judgment on July 30, 2015. T.C.B. and C.D.B. were awarded joint custody with T.C.B. named the domiciliary parent. C.D.B. was awarded alternating weekend custody during the school year and alternating weeks of custody in June and July. The parties were granted alternating holiday custody. Also on July 30, 2015, T.C.B.'s rule to have C.D.B. held in contempt was denied, her request to appoint a parenting coordinator was denied, and her request to modify child support was granted. C.D.B.'s request for sole custody was denied, his request for modification of custody was granted, and T.C.B.'s rule to hold C.D.B. in contempt pursuant to her June 1, 2015 filing was granted. C.D.B. was found in contempt for his violations of an April 29, 2013 stipulated judgment and sentenced to 30 days incarceration, which was suspended,

and the parties were ordered to share equally in the costs of the filing of those orders. On August 10, 2015, C.D.B. filed a motion for new trial and stay of judgment. The matter was set for hearing. On February 3, 2016, C.D.B.'s motion for new trial was granted, amending the judgment to provide that the child support obligation of $844.00 was made retroactive to July 30, 2015, and in all other aspects, the motion for new trial was denied.

On August 10, 2016, T.C.B. filed a rule for contempt and psychiatric evaluation. She asserted that C.D.B. had violated the custody judgment of July 30, 2015, and asked that he be ordered to undergo a psychiatric evaluation and be found in contempt of court. The matter was set for a hearing on September 19, 2016, and later continued.

On October 26, 2016, C.D.B. filed a rule for increased visitation, asserting that after T.C.B. had been granted domiciliary status he had moved to Slidell. He asked that he be allowed to go to the children's school at any time, have additional weekend time with the children, and that the exchanges of the children take place at school to minimize the parties' contact. He asked for visitation one week night, and for 60 percent of the holiday time. He also requested that the children live with him in the summer and visit their mother three weekends per month and for a maximum seven consecutive day vacation. The matter was set for hearing on November 28, 2016, and later continued.

On November 15, 2016, T.C.B. filed a motion to modify custody and to supplement her prior rule for contempt. She asserted that C.D.B. had not filed responsive pleadings to her rule for contempt and for psychiatric evaluation, that the rule had not been heard by the court, and that C.D.B. had filed a rule to modify custody in St. Tammany Parish in an attempt to forum shop after the Tangipahoa

3

trial court denied his motion for new trial two months earlier. She maintained that C.D.B. violated the custody plan on numerous occasions and reiterated that his erratic behavior warranted a mental health evaluation. T.C.B. maintained that C.D.B. refused to timely communicate about basic issues regarding the children. T.C.B. requested that she only be required to communicate with C.D.B. once a week and in making emergency decisions for the children. T.C.B. also asserted that there were problems with exchanging the children, thus, she asked that all exchanges be held at the Slidell Sheriff's Station, and that C.D.B. not approach her vehicle. T.C.B. asked that the court order C.D.B. to stay at least 100 feet away from her and her husband, B.C.W., at all times, including at extracurricular events for the children. She asked for sole custody, with limited visitation for C.D.B. The matter was set for a hearing on January 17, 2017, then continued to April 25, 2017, and later continued to July 11, 2017.

On May 11, 2017, C.D.B. filed a rule to enforce the stipulated judgment, make up visitation time, and for contempt. He asserted that his counsel had been informed by T.C.B.'s counsel that a recorded conversation between himself and one of the children had been intercepted by T.C.B. and that since that time, T.C.B. had not allowed his visitation with the children. He requested that the trial court order T.C.B. to comply with the judgment of July 30, 2015, that he be granted make up visitation time, and that T.C.B. be found in contempt of court and made to pay attorney fees and costs. His rule was denied pending the July 11, 2017 hearing.

On May 31, 2017, T.C.B. filed a petition for custody with request for ex parte relief, asserting that in an incident in April 2017, C.D.B. erupted in anger, threw his phone and broke it, and threatened to beat the children with a belt.

4

T.C.B. asserted that the children were so frightened they called their stepmother to come home and began recording the incident. T.C.B. maintained that the children had not returned to visit C.D.B. since that incident. T.C.B. asked for provisional sole custody pending a hearing in the matter with reasonable supervised visitation for C.D.B., and that after a hearing she be awarded sole custody with reasonable supervised visitation for C.D.B. On June 16, 2017, the trial court granted ex parte temporary custody of the children to T.C.B., with supervised visitation to C.D.B. on alternating weekends, and set a hearing on the matter for July 11, 2017.

At the July 11, 2017 hearing, the parties entered a stipulation whereby T.C.B. was given sole custody of the children on an interim basis. Dr. Kristin Luscher, a clinical psychologist, was appointed for family and reunification therapy "and to establish a routine and consistent periods of physical custody to be enjoyed by [C.D.B.]" The parties agreed to adhere to the recommendations of Dr. Luscher related to therapy, custody, and continuing contact between the parties and the children. All co-parenting guidelines previously in force were suspended. While C.D.B. was paying all of the supervision fees and reunification costs, his child support obligation was suspended. The parties agreed that if they could not meet with Dr. Luscher in the following two weeks, C.D.B. would have supervised visitation with a plain clothes female police officer. Pending further orders of the court, all matters were continued without date. The stipulated judgment was not signed until January 16, 2018, some six months later.

On December 13, 2017, T.C.B. filed a motion to suspend and terminate visitation, maintaining that despite the stipulated judgment, C.D.B. had continued to act inappropriately. She maintained that C.D.B. spoke inappropriately to the children via phone and text message, and that the children had drawn and written

5

disturbing things in counseling since beginning supervised visitation. T.C.B. asked that C.D.B.'s visitation be suspended pending a hearing. On December 18, 2017, the trial court suspended C.D.B.'s visitation pending a hearing and ordered that the children continue their therapy sessions with Dr. Luscher. On December 21, 2017, C.D.B. filed an opposition to the motion, maintaining that the motion was procedurally defective and should be denied.

On April 6, 2018, C.D.B. filed an emergency motion for visitation, asserting that he had been deprived of any substantial visitation with the children since April 2, 2017, and had only sporadic supervised custody on approximately 10 occasions after April 2, 2017. He asked for an ex parte order awarding visitation, and asked that T.C.B. be held in contempt. The motion was denied and a hearing was set for May 22, 2018.

On April 11, 2018, T.C.B. filed a rule for ex parte suspension of reunification therapy and visitation, and for contempt. T.C.B. maintained that after reunification therapy began C.D.B. continued to act inappropriately and in a manner damaging to the children. She asserted that C.D.B. had filed a petition for protection making false allegations in St. Tammany Parish and failed to inform the St. Tammany Parish court of the ongoing custody matter in Tangipahoa Parish and the stipulated judgment granting T.C.B. sole custody. She maintained that C.D.B. obtained a protective order, picked the children up at school, confiscated their cell phone, took them to his house, and told them to pack for a trip to Ruston. The St. Tammany Parish judge who issued the protective order revoked it the same day upon learning of the Tangipahoa Parish proceeding and the current custody judgment. T.C.B. maintained that when the police went to C.D.B.'s home to take the children and return them to her, C.D.B.'s wife initially told the police the

6

children were not at the home. T.C.B. asked that reunification therapy and visitation be suspended pending a hearing, that C.D.B. be assessed with her attorney fees and costs of the motion, and that he be made to show cause why visitation should not be permanently terminated or suspended. The matter was set for hearing on May 22, 2018.

The matters were heard on May 22, May 24, and July 11, 2018, and the trial court signed a judgment on August 7, 2018. The judgment provides in pertinent part that: T.C.B.'s rule for contempt and psychiatric evaluation filed on August 10, 2016 was denied; C.D.B.'s rule for increased visitation filed on October 26, 2016 was denied; T.C.B.'s motion to modify custody and supplemental rule for contempt filed on November 15, 2016 was granted to modify custody and denied as to contempt; C.D.B.'s ex parte rule to enforce stipulated judgment and make up time and rule for contempt filed on May 11, 2017 was denied; T.C.B.'s petition for custody and request for ex parte relief filed on May 31, 2017 was granted; T.C.B.'s motion to suspend and terminate visitation filed on December 13, 2017 was considered moot; C.D.B.'s rule for contempt filed on February 20, 2018 was denied; C.D.B.'s emergency motion for visitation filed on April 6, 2018 was denied; T.C.B.'s rule for ex parte suspension of reunification therapy and rule for contempt filed on April 11, 2018 was granted; and C.D.B.'s rule for contempt filed on May 4, 2018 was denied. T.C.B. was granted sole custody of the children and C.D.B. was denied visitation

Family therapy and reunification therapy with Dr. Luscher was terminated; C.D.B.'s child support obligation contained in a July 30, 2015 judgment, which had been suspended pursuant to the July 11, 2017 stipulation of the parties, was reinstated effective August 1, 2018. The 30-day sentence imposed on C.D.B. and

7

suspended pursuant to a judgment of July 30, 2015, was imposed and made executory. Pursuant to the finding of contempt regarding the April 11, 2018 rule for contempt filed by T.C.B., the court sentenced C.D.B. to 30 days of imprisonment. The sentence was imposed concurrent with the previously imposed 30 days of imprisonment.[1] C.D.B. was ordered to pay T.C.B. $1,000.00 in attorney fees, and to pay the court costs for T.C.B. filing the April 11, 2018 rule for contempt.

T.C.B. was ordered to maintain the children in individual counseling until discharged by their therapist, and C.D.B. was ordered to enroll in and complete a court-monitored domestic abuse intervention program. Prior to the trial court considering any award of reasonable visitation between C.D.B. and the children, C.D.B. must submit proof of completion of the court-monitored domestic abuse intervention program, a recommendation from a licensed therapist that he has received individual therapy to address his emotional and control issues and is in a position to resume visitation with the children, and a recommendation from the children's counselor or therapist that reunification therapy with C.D.B. is in their best interest and would not cause physical, emotional, or psychological damage to them. The judgment was rendered in open court on July 11, 2018, and signed on August 7, 2018. C.D.B. has appealed that judgment.

### ASSIGNMENTS OF ERROR

C.D.B. makes five assignments of error. He asserts that the trial court erred in (1) allowing T.C.B. to introduce a conversation obtained and published in violation of La. R.S. 15:1303, et seq., and the Louisiana Code of Evidence; (2) concluding that T.C.B. satisfied the **Bergeron** standard relative to modification of

---

[1] On July 12, 2018, C.D.B. filed a motion to reconsider sentence asking that he be allowed to serve the remainder of his sentence on weekends so that he could maintain his employment. On that same date, the trial court modified the sentence to allow the remaining time to be served on the weekends.

8

considered custody decrees and in determining that T.C.B. proved by clear and convincing evidence that an award of sole custody was in the best interests of the children; (3) determining that an award of reasonable visitation being awarded to C.D.B. was not in the best interests of the children, and that as a result, he was awarded no visitation rights whatsoever; (4) allowing a lay witness, Kimberlie Perez, to testify concerning her opinion and inferences based upon the out of court statements of the children; and (5) finding that C.D.B was in contempt and finding that T.C.B. was not in contempt, and sentencing C.D.B. to 30 days of imprisonment and ordering C.D.B. to pay T.C.B. $1,000.00 in attorney's fees and $150.00 in court costs.

## ASSIGNMENT OF ERROR NO. 4

In this assignment of error, C.D.B. asserts that the trial court erred in allowing a lay witness, Kimberlie Perez, to testify concerning her opinion and inferences based upon out-of-court statements made to her by the children. Ms. Perez is a licensed professional counselor with a master's degree in education with an emphasis on marriage and family therapy. She was tendered as a fact witness. Ms. Perez testified that she treated the children on and off for about three years, and in the year prior to trial, she had seen them roughly every other week. Ms. Perez testified that the more frequent counseling sessions followed a recorded incident with C.D.B. that "really upset" the children and "led to some conflict." She testified that the children were at times fearful of interaction with their father because it was "extreme."

Ms. Perez identified a drawing J.C.B.2 made of herself pictured behind bars and stated that J.C.B.2 told her she felt "trapped and unsafe" at C.D.B.'s house.

Ms. Perez testified that she felt forcing interaction between the children and their father could cause them harm and that the children wanted "peace and calmness."

C.D.B. maintains that Ms. Perez's testimony bolstered the "already tainted" testimony of Dr. Luscher. C.D.B. asserts that the trial court erred in allowing Dr. Perez to testify to things the children told her regarding a particular incident as she was not present and had no personal knowledge of the incident. C.D.B. maintains that it was T.C.B.'s decision to tender Ms. Perez as a fact witness, rather than an expert, and in that posture, Ms. Perez's testimony should not have been admitted or considered.

Louisiana Code of Evidence article 701 provides that if a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. The rules of evidence serve as a guide in child custody cases; however, the specific exclusionary rules and other provisions shall be applied only to the extent that they tend to promote the purposes of the hearing. La. C.E. art. 1101B(2).

While Ms. Perez did testify regarding what the children told her, this testimony was essential to her role as a counselor to the children. Further, this testimony was essentially cumulative to the testimony of Dr. Luscher and the children. Considering that the rules of evidence serve as a guide in child custody cases, but the exclusionary rules and other provisions shall be applied only to the extent that they tend to promote the purposes of the hearing, we find that the trial court did not abuse its discretion in allowing Ms. Perez, as a lay witness, to testify

10

concerning her opinions and inferences based on out-of-court statements made to her by the children. This assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 1

In this assignment of error, C.D.B. asserts that the trial court erred in allowing T.C.B. to introduce a conversation obtained and published in violation of La. R.S. 15:1303, et seq., and that the Louisiana Code of Evidence should not be interpreted so as to circumvent La. R.S. 15:1303.

Louisiana Revised Statutes 15:1303 provides in part:

A. Except as otherwise specifically provided in this Chapter, it shall be unlawful for any person to:

(1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, electronic or oral communication;

(2) Willfully use, endeavor to use, or procure any other person to use or endeavor to use, any electronic, mechanical, or other device to intercept any oral communication when:

(a) Such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire or electronic communication; or

(b) Such device transmits communications by radio or interferes with the transmission of such communication;

(3) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic, or oral communication in violation of this Subsection; or

(4) Willfully use, or endeavor to use, the contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic, or oral communication in violation of this Subsection.

B. Any person who violates the provisions of this Section shall be fined not more than ten thousand dollars and imprisoned for not less than two years nor more than ten years at hard labor.

. . . . .

C. (4) It shall not be unlawful under this Chapter for a person not acting under color of law to intercept a wire, electronic, or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception, unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the constitution or laws of the United States or of the state or for the purpose of committing any other injurious act.

Louisiana Revised Statute 15:1307 provides in part:

A. Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the state, or a political subdivision thereof, if the disclosure of that information would be in violation of this Chapter.

The rules of evidence serve as a guide in child custody cases; however, the specific exclusionary rules and other provisions shall be applied only to the extent that they tend to promote the purposes of the proceeding. La. C.E. art. 1101B(2). Generally, the trial court is granted broad discretion on its evidentiary rulings and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. **Henry v. Sullivan**, 2016-0564 (La. App. 1 Cir. 7/12/17), 223 So.3d 1263, 1274. Except as otherwise provided by law, all relevant evidence is admissible. La. C.E. art. 402.

On April 1, 2017, J.C.B.1 and J.C.B.2, eleven years old at the time, were at C.D.B.'s house when a conversation turned heated on C.D.B.'s part. J.C.B.1 had a cellphone with her. As the discussion escalated, J.C.B.1 indicated to J.C.B.2 that she was going to record the conversation, and turned on the recorder on the cellphone. The recording was introduced into evidence at the trial, over the objection of C.D.B. The trial court found that the recording was admissible, and

12

further, that C.D.B.'s counsel had opened the door to the recording being admitted by questioning Dr. Luscher about the recording.

C.D.B.'s attorney based his objection upon the reasoning in **Smith v. Smith**, 2004-2168 (La. App. 1 Cir. 9/28/05), 923 So.2d 732, in which the trial court allowed the father, Mr. Smith, who was seeking modification of the parties' stipulated judgment awarding joint custody, to introduce into evidence recorded phone conversations between the parties' minor child and the mother, Ms. Duncan, that were recorded without Ms. Duncan's knowledge. After the trial, the court ruled in favor of Mr. Smith. The trial court awarded Mr. Smith sole custody, and granted Ms. Duncan supervised visitation. Ms. Duncan appealed, asserting in part that the trial court erred in admitting the recording into evidence because it violated La. R.S. 15:1303 and was inadmissible under La. R.S. 15:1307. **Smith**, 923 So.2d at 736.

Mr. Smith maintained that he consented to the interception and tape-recording on behalf of his child, while the child was in his home, and hence, his action fell under the consent exception to the wiretapping statute. **Smith**, 923 So.2d at 737-738. This court in **Smith** determined that since all of the federal courts that have reviewed this issue have determined that the vicarious consent doctrine is applicable to the consent exceptions set forth in the federal wiretapping statute (when the parent has a good faith, objectively reasonable basis to believe that it is necessary and in the child's best interest), then this same doctrine should be applicable to the consent exception set forth in the Louisiana wiretapping statute, under the same, limited circumstances. **Smith**, 923 So.2d at 740.

In **Smith**, the psychological custody evaluator, Dr. Alicia Pellegrin, determined that Ms. Duncan's behavior was having a detrimental effect on the

13

child. This behavior included telling the child everything about the custody battle. Dr. Pellegrin advised that Ms. Duncan refrain from such behavior and allow Mr. Smith to maintain a positive relationship with the child. Mr. Smith began recording conversations on his home phone between Ms. Duncan and the child because of his concerns that Ms. Duncan would not cease the detrimental conduct. **Smith**, 923 at 740-741, 744.

On appeal, this court found that Mr. Smith had a good faith, objectionably reasonable basis for believing that it was necessary and in the child's best interest for him to consent, on behalf of the child, to the interception of the child's conversation with Ms. Duncan. Consequently, this court found that Mr. Smith's actions fell under the consent exception to La. R.S. 15:1303(C)(4), and found no abuse in the trial court's discretion in admitting the wiretapped conversation into evidence at the custody hearing. **Smith**, 923 So.2d at 741.

This case differs from **Smith**, and from the other cases cited by the parties, as in this case the recording was made by the child, rather than the parent. The children and C.D.B. were having a face-to-face conversation when J.C.B.1 showed J.C.B.2 that she had turned on the recording device on her phone. At the time of the recording the children were eleven years old. C.D.B. knew that the girls had a cellphone with them. T.C.B. maintains that she vicariously consented to the recording of the conversation on behalf of the children.

J.C.B.1 described the events taking place during the recorded time period in detail, stating that C.D.B. made the girls repeat things about the parties' divorce and it seemed to be like a "criminal kind of thing" from a movie. During the recording the children's grandmother called, and their father told the grandmother they would call her back later. J.C.B.1 testified, "[W]e were really screaming, like,

14

don't hang up the phone because we wanted her to come and get us because we were, like, scared for our lives." J.C.B.1 testified that her father would "constantly" talk bad about her mother and stepfather. She testified that "[I]t was, like, I felt like – I'm shaking right now thinking about it – I felt like he was about to hurt one of us really badly, and that we'd have to call someone, like the police or something."

J.C.B.2 testified about the recording: "It was when he was screaming at us and he was still angry about [B.C.W.] and about the marriage and he was calling my mom names. And it was just really, it was, like, scary and terrifying."

J.C.B.1 clearly consented to the recording because she made the recording. J.C.B.2 contemporaneously consented to the recording by J.C.B.1. Both J.C.B.1 and J.C.B.2 authenticated the recording at trial and testified about the event and the conversation. J.C.B.1 testified:

> [A]round every weekend that we would visit him before I took that recording, there was a lot of, like, constant - - he would talk about my mom and his divorce. He would say bad stuff about [B.C.W.], which is my stepdad. And he would just go on and on, and he would make us cry constantly. And so up to the recording time, I had just had enough of it, so it was, like, I need some proof. And so that's why I took that.

The children had the capacity to consent, and we find that this recordation falls under the consent exception for the interception of an oral communication as set forth in La. R.S. 15:1303(C)(4).[2] We further find that, under the facts of this case, the vicarious consent of T.C.B. was not required on behalf of J.C.B.1 and J.C.B.2.

Thus, we find no abuse of discretion by the trial court in allowing the recording into evidence. Further, we note that even without the recording in

---

[2] Dr. Luscher testified that the girls are mature. The trial court found that J.C.B.1 and J.C.B.2 are very articulate and competent.

15

evidence, both children testified about the April 2017 incident and its effect on them, and Dr. Luscher testified about the effects of the incident on the children. This assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

In this assignment of error, C.D.B. maintains that the trial court erred in concluding that T.C.B. satisfied the **Bergeron** standard relative to modification of considered custody decrees and erred in determining that T.C.B. proved by clear and convincing evidence that an award of sole custody was in the best interest of the children.

When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. **Bergeron v. Bergeron**, 492 So.2d 1193, 1200 (La. 1986). Upon appellate review, the determination of the trial court in child custody matters is entitled to great weight, and its discretion will not be disturbed on review in the absence of a clear showing of abuse. **Id.**, 492 So.2d at 1196; **Howze v. Howze**, 2017-0358 (La. App. 1 Cir. 9/28/17), 232 So.3d 606, 608-609.

Dr. Luscher, an expert in psychology, reunification, and family therapy, testified that while T.C.B. was reluctant to go through the reunification process due to concerns about C.D.B., she was cooperative. Dr. Luscher testified that there were early positive steps in the reunification therapy; however, C.D.B. continued to speak negatively about T.C.B. to the children and told the children they had been "brainwashed."

16

Dr. Luscher did not believe the children were alienated by their mother, but rather, they were aligned with her. Dr. Luscher tried moving the visits out of her office for a change and did get the children to spend more time outside of her office with their father, in particular, over the Thanksgiving school break. However, during a visit, C.D.B. took J.C.B.2's phone, saw that she had entered "Do Not Answer" by his phone number, and told her "you're f------ busted." Dr. Luscher testified that this event pushed the relationship "back to where we were before." Dr. Luscher testified that C.D.B. could not always control himself and that sometimes his behavior was verbally and emotionally abusive.

Dr. Luscher described C.D.B. as "verbally punitive, chastising. . . I mean he'd get frustrated when he could not control or couldn't change their way of thinking." Dr. Luscher described C.D.B. as having a "pattern of impulse problems." Dr. Luscher described the February 28, 2018 reunification therapy session as "very bad" and she ended the session early. She testified that C.D.B. "was on a path of his frustration and his anger . . . being directed at the girls, that they were brainwashed, that they needed to think for themselves." Dr. Luscher testified that J.C.B.1 then said "I'm sad when I have to come here . . . I'm sad because I don't trust you . . . I don't feel safe with you."

Dr. Luscher testified that she tried to get the session back on track, telling C.D.B. "[t]his isn't a wise way to use . . . your time. Let's refocus." However, she explained, "[H]e was going to do it his way. He was going to . . . tell them that they were wrong, that their Mom was the problem, that they were alienated, that they were too young to understand this but one day they would. And it just continued from there." C.D.B. told J.C.B.1, "One day you're going to figure this out. You're the smarty."

Dr. Luscher testified "at that point I stopped [the session]." Dr. Luscher went to J.C.B.2, who said "I understand. I'm not the smart one." Dr. Luscher testified that she told J.C.B.2 "[t]hat wasn't true and [that] was . . . unkind and uncalled for." J.C.B.2 replied, "[W]ell, I'm used to it." When Dr. Luscher asked what she meant, J.C.B.2 replied, "[W]ell, it's like a water balloon. He'll just fill and fill and fill and fill . . . [Y]ou just don't know when he's going to pop." After Dr. Luscher ended the session early, C.D.B. walked out of Dr. Luscher's office and threw his credit card across her assistant's desk.

Dr. Luscher testified that C.D.B. emailed her after the session to tell her that the therapy wasn't successful and she wasn't doing her job. Dr. Luscher testified that she responded by email to C.D.B., informing him that his behavior at the session was demeaning, belittling and unacceptable. Dr. Luscher asked C.D.B. to "step back and take a look at what you contribute to this and what your behavior was in the context of this." After learning that C.D.B. had gone to St. Tammany Parish to get a protective order and had taken the children from school, Dr. Luscher asked the court to release her from the case. She testified, "I felt this was beyond the control of just one person." Dr. Luscher recommended continued individual therapy for the children. She recommended that C.D.B. have individual therapy regarding his issues with reactivity, impulse control, and his anger toward T.C.B., before moving forward with reunification therapy again. She stated "I don't know how you can move forward with reunification sessions at this point, until you get some better control and consistency."

When questioned about his responsibility for the lack of progress in the reunification process with the children, C.D.B. testified that "I believe my responsibility for the lack of [progress] is very minimal compared to [T.C.B.]"

18

When asked whether he had followed the instructions of Dr. Luscher, C.D.B. testified "I admit I'm not perfect, so I'm sure that there's some – maybe something minimal that is there." When asked whose fault it was for some conflict during the reunification process, C.D.B. answered that it was mostly T.C.B.'s fault. C.D.B. testified that if the children said they were afraid of him it would be a lie, if they said they didn't want to visit with him it would be a lie, and if they said they didn't want to speak to him on the phone it would also be a lie.

Both children testified at trial that they did not want any type of relationship at all with C.D.B. Ms. Perez testified that the children should not be forced to interact with C.D.B. and that they were "incredibly fearful" of him. She stated that forcing the children to have contact with C.D.B. could cause more harm to them. T.C.B. testified that the children had become "old enough to . . . really observe and see what things are going on. And at this point they have become very scared." T.C.B. further testified "I am absolutely afraid for their safety and [wellbeing] . . . If [C.D.B.] can't act and behave as he ought to as a parent in the one-hour [therapy] sessions, I certainly don't know how he would do it outside of that."

In its written reasons for judgment, the trial noted that it:

[F]ound [C.D.B.'s] testimony to be troubling and not entirely truthful. When asked to testify regarding adverse actions he has taken since July 2015, he was unable to recollect those events. On the other hand, when questioned about incidents which placed [T.C.B.] or others in [a] negative light he was very clear in his recollection. Additionally, and perhaps understandable to some extent, [C.D.B.'s] clear frustration and anger with the proceedings came through during his testimony.

After a three-day trial, and with thorough and well-reasoned oral and written reasons for judgment, the trial court found that T.C.B. had carried the burden of proof pursuant to the **Bergeron** standard, i.e., that the continuation of the joint custody plan was so deleterious to the children as to justify a modification of the

19

custody decree, and that clear and convincing evidence established that it was in the best interest of the children for T.C.B. to have sole custody. After a thorough review, we find no clear showing of abuse of discretion by the trial court in awarding sole custody of the children to T.C.B. <u>See</u> **Bergeron**, 492 So.2d at 1200. This assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 3

In this assignment of error, C.D.B. maintains that the trial court erred in failing to award him visitation with his children. The trial court judgment ordered C.D.B. to enroll in and complete a court-monitored domestic abuse intervention program. It also provided that prior to the court considering any award of reasonable visitation with the children, he must submit proof of completion of the court-monitored domestic abuse intervention program; a recommendation from a licensed therapist that he has received individual therapy to address his emotional and control issues and is in a position to resume visitation with his children; and a recommendation from the children's counselor or therapist that reunification therapy with him is in their best interest and would not cause physical, emotional, or psychological damage to them.

The children were twelve years old at the time of the hearing. The trial judge asked J.C.B.1 how she felt the day the recording was made. J.C.B.1 answered "I actually had a friend that was supposed to come over and that's mainly why I tried to get her to come over because I knew that he wouldn't act like that around her." She stated "I'm shaking right now thinking about it – I felt like he was about to hurt one of us really badly, and that we'd have to call someone, like the police or something."

J.C.B.1 testified that she was scared when C.D.B. had the police take her and

20

her sister from school using the protective order. She stated that when she got to her father's house, her father and stepmother followed her everywhere and took her phone away. She testified that she and her sister locked themselves in the bathroom and J.C.B.2 suggested they try and escape. J.C.B.1 testified, "I was, like, praying constantly. God's the only thing that can really get me through that."

The trial judge asked J.C.B.1, "What type of relationship would you like to have with your Dad going forward?" J.C.B.1 answered, "I mean, if I could turn him into [my stepdad], that would be great. If not, I don't want to see him." The trial judge asked her, "What about if he wanted to call you?" She replied "No." The trial judge asked, "What about text messages?" She replied, "No, sir." The trial judge asked, "No communication whatsoever?" J.C.B.1 answered, "No, sir. I know it's . . . sad." She continued, "But he's just put me through too much for that anymore."

The trial judge asked J.C.B.2, "[G]oing forward, what type of relationship would you like to have with [your] Dad?" She answered, "I feel like I don't really want to see him at all. Like, I just don't want to have a relationship with him at all." The trial judge continued, "Is there something he could do to maybe regain your trust so that you would be willing to maybe have some type of visitation with him?" J.C.B.2 answered, "Well, I feel like he's tried to do that before, and I had so much faith in him. And I thought this is really going to work. But it didn't ever work, and he just kind of, like, stopped. And I just feel like he's lost my trust for now, like, for good."

On cross-examination, Dr. Luscher testified that there was "some control and manipulation in [C.D.B.'s] interactions with the [children]," and described it as "kind of like interpersonal violence sorts of things." She further testified that "his

21

verbal interactions with his girls are not healthy." On redirect examination, T.C.B.'s attorney questioned Dr. Luscher: "You said that you had witnessed unhealthy things which had occurred right in front of you in session. Would you have concerns that this would also happen if someone was not there to monitor any interaction between [C.D.B.] and the girls?" Dr. Luscher answered "Yes."

After a thorough review, we find no abuse of discretion by the trial court in finding that it was in the best interest of the children to award no visitation to C.D.B. at this time and to require that C.D.B. meet certain conditions before considering any future award of visitation. This assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 5

In this assignment of error, C.D.B. asserts that the trial court erred in finding him in contempt while finding T.C.B. was not in contempt, and erred in sentencing him to a term of 30 days of imprisonment and ordering him to pay T.C.B. $1,000.00 in attorney's fees and $150.00 in court costs.

The trial court is vested with great discretion in determining whether a party should be held in contempt for disobeying a court order, and the court's decision should be reversed only when the appellate court discerns an abuse of that discretion. **Boudreaux v. Vankerkhove**, 2007-2555 (La. App. 1 Cir. 8/11/08), 993 So.2d 725, 733.

The record shows that C.D.B. filed a petition for protection from abuse[3] on March 29, 2018, in the Twenty-Second Judicial District Court in St. Tammany

---

[3] C.D.B. contends in brief to this court that there is no evidence that his petition for protective order was falsified. However, he conceded on cross-examination that one felony charge of perjury and two misdemeanor charges of interfering with child custody were pending against him as a result of his filing the petition for protective order. Further, the evidence includes a stipulated judgment rendered by the Twenty-Second Judicial District Court, reflecting the following stipulations by the parties: 1) the petition for protection from abuse filed by C.D.B. was dismissed with prejudice at C.D.B's cost; 2) C.D.B. shall pay $5,552.00 in attorney fees to T.C.B.'s attorney and $50.00 in fees to the St. Tammany Parish Sheriff's Office; 4) C.D.B. shall not file any pleadings regarding custody of a protective order nature in St. Tammany Parish without first advising the court of any ongoing proceedings in any other court, the

22

Parish. In the petition C.D.B. failed to indicate there was a suit pending or order in effect involving the children, despite the form requesting that information. He indicated that T.C.B. had slapped, punched, choked, shoved, stalked, and threatened the children with bodily harm, threatened the children's lives, and abused the children.[4] Based upon this petition, a protective order was granted by the court in St. Tammany Parish at 1:55 p.m. that same day and law enforcement authorities went to the children's school to hand the children over to C.D.B. J.C.B.2 testified she tried but was unable to reach their mother to tell her what was happening. C.D.B.'s wife took J.C.B.2's phone away (J.C.B.1 had left her phone at home that day). C.D.B. took the children to his house, and told them they would all be traveling to Ruston to visit family. J.C.B.2 indicated that she tried to run away from her father's house three times on that day, and kept getting caught.

T.C.B. learned of the ex parte protective order when her husband went to pick the children up from school. The court in St. Tammany Parish was thereafter notified of the ongoing custody order and proceedings in Tangipahoa Parish, and at 4:35 p.m. the St. Tammany Parish Court revoked and vacated the order of protection and ordered law enforcement to return the children to T.C.B. immediately.

The police went to C.D.B.'s home to retrieve the children and return them to T.C.B. C.D.B.'s wife answered the door and told the police that the children were not there while C.D.B. attempted to keep the children in the back yard, hidden from the police. J.C.B.2 testified that she tried to yell out so that the police would

court may confer with other courts in its discretion; and 5) C.D.B. shall not appear on the children's school campus without further order of the Twenty-First Judicial District Court.

[4] The children denied those allegations in their testimony. Further, at a reunification therapy session with Dr. Luscher the day before he filed the petition for protection, C.D.B. did not bring up any issue of suspected abuse by T.C.B.

23

hear her and know she was there. The police took the children and returned them to T.C.B. J.C.B.2 indicated that the whole event was "scary." After thorough review, we find no abuse of discretion in the trial court's ruling finding C.D.B. in contempt of court and sentencing him to 30 days of imprisonment, imposed concurrently with the previously imposed 30-day sentence which was made executory.

C.D.B. asserts that the trial court erred in not finding T.C.B. in contempt of court for failing to comply with the visitation schedule after the phone recording incident. T.C.B. testified that "I did not let my kids go back over there because I was fearful and they were refusing to go." Dr. Luscher testified that T.C.B. was "certainly afraid of [C.D.B.], distrustful that he would not do something that would emotionally or in someway [sic] harm the children." Dr. Luscher testified that she believed that T.C.B. was ultimately justified in her fearfulness and distrust of what C.D.B. might do. After a thorough review, we find no abuse of the trial court's great discretion in not finding T.C.B. in contempt of court.

After noting that this was a second finding of contempt against C.D.B., the trial court ordered C.D.B. to pay T.C.B.'s attorney's fees in the amount of $1,000.00 for the preparation and filing of her rule for contempt, and to pay the $150.00 court cost for T.C.B. filing the rule. After a thorough review, we find no abuse of the trial court's discretion in that determination. See La. R.S. 13:4611(1)(d)(iv), (g). This assignment of error has no merit.

## DECREE

For the foregoing reasons, the trial court judgment is affirmed. The costs of this appeal are assessed against C.D.B.

**AFFIRMED.**

24

| T.C.B. | NO. 2019 CU 0115 |
| --- | --- |
| VERSUS | COURT OF APPEAL |
| C.D.B. | FIRST CIRCUIT |
| | STATE OF LOUISIANA |

Consolidated with

| T.C.W. | NO. 2019 CU 0116 |
| --- | --- |
| VERSUS | COURT OF APPEAL |
| C.D.B. | FIRST CIRCUIT |
| | STATE OF LOUISIANA |



**HOLDRIDGE, J., concurring in part and dissenting in part.**

I respectfully concur in part and dissent in part. I concur insofar as the opinion concludes that the trial court did not abuse its discretion in allowing the recording into evidence. I disagree, however, with the majority's analysis. The recording of the father's actions towards the two minor children depicted the verbal abuse of the father directed at the children. The recording of the father was made by a cell phone of the victim/child. The permission of the father was not necessary to record his abusive behavior. A proper foundation was laid for the admissibility of the recording and it was admissible to show the verbal abuse.

I dissent from the majority's determination that the trial court did not err in admitting Ms. Perez's opinion testimony. Ms. Perez was not tendered as an expert. Therefore, she should not have been allowed to give any opinions or make any inferences from facts. As a fact witness, she could only testify to things of which she had personal knowledge. See La. C.E. art. 602.